Hillsborough, ⎱
April 7, 1903. ⎰

HORAN *v.* BYRNES.

The statute declaring that any structure in the nature of a fence which unnecessarily exceeds five feet in height and is erected for the purpose of annoying the owner or occupant of adjoining premises shall be deemed a private nuisance, and providing that an owner or occupant thereby injured in the comfort or enjoyment of his estate may maintain an action of tort for the damages sustained, was designed to prohibit an unnecessary and unreasonable use of land by the owner thereof, and is not void as an unconstitutional interference with the rights of private property.

Evidence that a person present at a former trial failed to deny a statement then attributed to him is incompetent to prove the falsity of his denial at a subsequent hearing, and its admission to the prejudice of the adverse party furnishes sufficient cause for setting aside a verdict.

CASE, under sections 28 and 29, chapter 143, Public Statutes, for maintaining a structure in the nature of a fence, in violation of the statute. Trial by jury and verdict for the plaintiff. Transferred from the September term, 1901, of the superior court by *Peaslee*, J.

The defendant moved for a nonsuit, on the ground that the statute upon which the action is based is unconstitutional. The motion was denied, and he excepted.

The following testimony was admitted subject to exception: The defendant's wife, Ann, who was a witness in his behalf, was asked upon cross-examination if she had not said to the plaintiff, "the fence is going higher: we won't leave you a bit of room." Upon her denial of the statement, she was asked if at another trial, when she was present, this statement had not been testified to, and if she did not fail to then deny it. This she admitted. She denied having any ill-will toward the plaintiff or his family. The plaintiff's wife testified that she lost her wedding ring on the Byrnes premises, and that the ring came into the hands of Mrs. Byrnes, who refused to deliver it to the witness, but compelled her to go to the police station to recover her property.

*Patrick H. Sullivan*, for the plaintiff.

*Brown, Jones & Warren*, for the defendant.

PARSONS, C. J. "Any fence or other structure in the nature of a fence, unnecessarily exceeding five feet in height, erected or maintained for the purpose of annoying the owners or occupants of adjoining property, shall be deemed a private nuisance.

"Any owner or occupant, injured either in his comfort or the enjoyment of his estate by such nuisance, may have an action of tort for the damage sustained thereby.

"If the plaintiff recovers judgment in the action, the defendant shall cause the removal of the nuisance within thirty days from the date of the judgment, and for each day he shall permit the nuisance to remain after the expiration of said thirty days he shall incur a penalty of ten dollars for the use of the party injured." P. S., c. 143, ss. 28, 29, 30.

The act forbids the use by one landowner of his land for the unnecessary erection of a fence exceeding five feet in height, when the purpose of such unnecessary height is the annoyance of the adjoining owner or occupant, if such unnecessary height injures the adjoining owner in his comfort or the enjoyment of his estate. The claim of the defendant in support of his motion for a nonsuit, that the statute is unconstitutional, raises the question whether

the statutory prohibition is an interference with the defendant's "natural, essential, and inherent" right of "acquiring, possessing, and protecting property," or deprives him of that protection in its enjoyment, which is the right of "every member of the community." Bill of Rights, *arts.* 2, 12.

"The structure here referred to is one designed to take the place of a fence in the ordinary meaning of the term,—a structure erected upon or near the dividing line between adjoining owners for the purpose of separating the occupancy of their lands." *Lovell* v. *Noyes*, 69 N. H. 263; *Spaulding* v. *Smith*, 162 Mass. 543. The correlative right and duty of adjoining owners and occupants of lands at the common boundary between them is matter of general and public concern. The existence or not of an obligation to fence, what should constitute performance, and what liabilities should follow from non-performance, are matters as to which the establishment of a definite rule plainly promotes the public peace and comfort and the security of property rights in real estate. All these questions were early settled by the legislature. It prescribed the obligation to fence as between adjoining owners, provided a method for the enforcement of the duty, declared the legal liability for failure to fence, and defined a sufficient fence. There was legislation upon the subject in 1687, 1692, 1743, and 1792 (1 N. H. Prov. Laws (Batch. Ed.) 200; 3 Prov. Papers 176; Laws 1696–1725, *p.* 117; Laws, *ed.* 1761, *p.* 225; Act of Feb. 8, 1791,—Laws, *ed.* 1797, *p.* 331); while in 1842 (R. S., *c.* 136, *s.* 4) the requirements of a sufficient fence were prescribed. Such a fence need not be more than four feet high. P. S., *c.* 143, *s.* 5. Although these provisions in one sense imposed a burden upon real estate ownership, the purpose of the legislature, as shown by the titles of the earlier acts "for the regulation of cattle, cornfields, and fences," was to make provision in reference to the control of domestic animals—"to regulate the use and keeping of such property." *Morey* v. *Brown*, 42 N. H. 373, 375. No one has ever been required to fence his land who does not improve it, or who "lays it in common." P. S., *c.* 143, *s.* 14. The theory of these statutes is simply that where adjoining owners each desire the exclusive use of their land, the expense of effecting the mutual purpose should be equally divided between them. P. S., *c.* 143, *s.* 1.

The constitutional objection made to the present statute raises the question, if it appears that the statute is an interference with the defendant's property right, whether the interference is or not one which the legislature might properly make as a regulation of the use of property. The constitutionality of similar statutes has been upheld upon the latter ground, as being merely a small limi-

tation of existing rights incident to property, which under the police power may be imposed for the sake of preventing a manifest evil. "It is hard," it has been said, "to imagine a more insignificant curtailment of the rights of property." *Rideout* v. *Knox*, 148 Mass. 368, 372, 373; *Karasek* v. *Peier*, 22 Wash. 419; *Western etc. Co.* v. *Knickerbocker*, 103 Cal. 111. Similar statutes in Maine, Vermont, and Connecticut have been before the courts, but it has not been suggested that the power of the legislature to adopt them has been attacked in those states. *Lord* v. *Langdon*, 91 Me. 221; *Harbison* v. *White*, 46 Conn. 106; *Gallagher* v. *Dodge*, 48 Conn. 387,—40 L. R. A. 181–183, note.

The present statute was passed in 1887. Laws 1887, *c.* 91. In *Hunt* v. *Coggin*, 66 N. H. 140, the verdict was for the defendant; and in *Horan* v. *Byrnes*, 70 N. H. 531, the defendant waived any objection to the statute upon this ground. In *Lovell* v. *Noyes*, 69 N. H. 263, the question was whether a building was within the terms of the statute. The constitutional question is now presented for the first time.

It is objected in answer to the argument that statutes like the present are within the constitutional exercise of the police power, involving for the general good some slight limitation of existing property rights, that if one incident of the property right in real estate is the right to use it maliciously for the sole purpose of injuring another, it is as much an invasion of the right to take it from a small portion as from the whole of one's property; and that the matter in question concerns private individuals and not the public in general, and hence does not come within the police power. *State* v. *White*, 64 N. H. 48, 50. It may be thought these objections are successfully answered in the cases cited, or that, if not there answered, a satisfactory answer can be found. But a discussion of these objections does not reach the fundamental question in the case.

"The statute was designed to prevent an act the sole effect of which would be to annoy or injure another." *Lovell* v. *Noyes*, 69 N. H. 263. The primary question, therefore, is whether one's right to use property solely to injure another is a part of his property right in real estate, which is so protected by the constitution that the prohibition of such use is not within the general power of legislation "for the benefit and welfare of this state and for the governing and ordering thereof." Const., *art.* 5. Upon the question whether a fence on or near the division line between adjoining landowners, maliciously built to an unreasonable height for the sole purpose of annoying and injuring the adjoining owner or occupant, is a nuisance which can in the absence of statutory authority be abated by an injunction, the courts are in conflict. *Letts*

v. *Kessler*, 54 Ohio St. 73, answers the question in the negative, while an opposite conclusion is reached in Michigan. *Burke* v. *Smith*, 69 Mich. 380; *Flaherty* v. *Moran*, 81 Mich. 52; *Kirkwood* v. *Finegan*, 95 Mich. 543. In *Rideout* v. *Knox*, 148 Mass. 368, and *Karasek* v. *Peier*, 22 Wash. 419, cases in which the power of the legislature to enact a statute similar to that under consideration is attacked and upheld, it is conceded " that to a large extent the power to use one's property malevolently, in any way which would be lawful for other ends, is an incident of property which cannot be taken away even by legislation." *Rideout* v. *Knox*, *supra*, 372.

The conclusion that a landowner's property right in real estate includes the right to use it solely for the injury and annoyance of his neighbor, without intending to subserve any useful purpose of his own, is "based upon a narrow view of the effect of the land titles," and is reached "by the strict enforcement of a technical rule of ownership briefly expressed in an ancient maxim," *cujus est solum, ejus est usque ad coelum*. The courts of this state have had in some respects, at least, a different understanding of the elements of landownership. As to the use of land in the control of surface water, the enjoyment of water percolating beneath the surface, and the use generally that may be rightfully made of real estate by the owner or occupant, the test has been considered to be not merely whether the act was an exercise of dominion on the land regardless of the injury to other land, but the reasonableness of the use under all the circumstances, including the necessity and advantage to one and the unavoidable injury to the other. *Franklin* v. *Durgee*, 71 N. H. 186; *Ladd* v. *Brick Co.*, 68 N. H. 185; *Swett* v. *Cutts*, 50 N. H. 439; *Bassett* v. *Company*, 43 N. H. 569, 577. It has been said that the rule of absolute dominion is easier of application. *Chase* v. *Silverstone*, 62 Me. 175, 183. This view, however, does not seem to be upheld by the difficulties met in its application in reference to surface waters. See *Franklin* v. *Durgee*, 71 N. H. 186, 189. But however that may be, difficulty in administration is not a sufficient reason for the denial of justice. Cases like *Chatfield* v. *Wilson*, 28 Vt. 49, and *Phelps* v. *Nowlen*, 72 N. Y. 39, in which the principle of the maxim relied upon is applied to waters in the soil, are not authority here, where a contrary view is entertained. *Franklin* v. *Durgee* and *Bassett* v. *Company*, *supra*.

Aside from the authorities in cases in which the control of waters was in question, the leading case appears to be *Mahan* v. *Brown*, 13 Wend. 261. Here, although the plaintiff alleged that the fence complained of was erected solely to injure her, the decision is upon the ground that by the erection of the fence the plain-

tiff is deprived of no right, but is merely prevented from acquiring a right. If by enjoyment of light and air across his neighbor's land for the prescriptive period a landowner could acquire a right to such enjoyment, the building of a fence as an assertion of a contrary right and to prevent the acquiring of such easement would be a building for a necessary and useful purpose, and not for the sole purpose of annoying another. The case standing upon a view of the effect of non-user of a right to build, now generally abandoned in this country (Wash. Ease. 490, 497, 498), is not of value in the present discussion. The argument generally is, that the motive with which one does an act otherwise lawful is immaterial; and hence, as it must be conceded that a landowner has the right to build on his land as he conceives may best subserve his interests, the act lawful for a useful purpose is not made unlawful and a nuisance merely by the intent accompanying it.

Whether the first proposition is entirely true may perhaps be doubted. Cases cited to support the proposition (*Walker* v. *Cronin*, 107 Mass. 555; *Phelps* v. *Nowlen*, 72 N. Y. 39) do not support it in its entirety. See *Chesley* v. *King*, 74 Me. 164. In *Houston* v. *Laffee*, 46 N. H. 505, which was trespass for cutting an aqueduct pipe maintained by the plaintiff upon the defendant's land by a parol license, it was held that if the cutting of the pipe was done simply for the purpose of putting an end to the license, and without any malice or intentional wrong, the defendant would not be liable; but if the pipe was cut " wantonly, unnecessarily, maliciously, and with a view . . . to injure the plaintiff," the defendant would be liable. It is true that an act which one has the right to do under all circumstances, like the bringing of a suit upon a valid claim (*Friel* v. *Plumer*, 69 N. H. 498), cannot be made actionable by the motive which accompanies it. But as applied to the use of real estate the argument begs the question, which is whether the enjoyment of real estate includes the right to use it solely to injure another. Because when employed for a useful purpose such use may rightfully injure another, it does not follow that the same use for a wrongful purpose may also rightfully injure another, except upon the theory of absolute dominion, for the character of the use is an element of the right.

"As a general proposition, it is safe to say that the owner of land has a right to make a reasonable use of his property; and that right extends as well to an unlimited distance above the earth's surface as to an unlimited distance below. He may not only dig for a foundation and a cellar as deep as he pleases, but he may erect his building as high as he pleases into the air, subject all the time, of course, to a proper application of the doctrine contained in the maxim, *sic utere tuo ut alienum non lædas*. The erec-

tion and maintenance of buildings for habitation or business is a customary and reasonable use of land. Of course the landowner, in making such erections, must be held to the exercise of all due care against infringing the legal rights of others, to be determined by the nature of the rights and interests to be affected, and all the circumstances of each particular case." *Ladd,* J., in *Garland* v. *Towne,* 55 N. H. 55, 58.

" Property in land must be considered, for many purposes, not as an absolute, unrestricted dominion, but as an aggregation of qualified privileges, the limits of which are prescribed by the equality of rights and the correlation of rights and obligations necessary for the highest enjoyment of land by the entire community of proprietors. . . . The soil is often called property, and this use of language is sufficiently accurate for some purposes. But the proposition that the soil is property conveys a very imperfect idea of the numerous and variously limited rights comprised in landed estate; and it is sometimes necessary to remember that the name of property belongs to some of the essential proprietary rights vested in the person called the owner of the soil. . . . So these proprietary rights, which are the only valuable ingredients of a landowner's property, may be taken from him, without an asportation or adverse personal occupation of that portion of the earth which is his in the limited sense of being the subject of certain legally recognized proprietary rights which he may exercise for a short time. . . . One of Eaton's proprietary rights was the correlative of R's duty of abstaining from such a use of air and water, and from such an interference with their quality and circulation, as would be unreasonable and injurious to the enjoyment of Eaton's farm." *Thompson* v. *Androscoggin Co.,* 54 N. H. 545, 551, 552, 554. " Excavations maliciously made in one's own land, with a view to destroy a spring or well in his neighbor's land, could not be regarded as reasonable." *Swett* v. *Cutts,* 50 N. H. 439, 447.

"If a man has no right to dig a hole upon his premises, not for any benefit to himself or his premises, but for the express purpose of destroying his neighbor's spring, why can he be permitted to shut out light and air from his neighbor's windows maliciously, and without profit or benefit to himself? By analogy, it seems to me that the same principle applies in both cases, and that the law will interpose and prevent the wanton injury in both cases. . . . It must be remembered that no man has a legal right to make a malicious use of his property . . . for the avowed purpose of damaging his neighbor. To hold otherwise would make the law a convenient engine in cases like the present to injure and destroy the peace and comfort, and to damage the property, of one's neigh-

bor, for no other than a wicked purpose, which in itself is or ought to be unlawful. The right to do this cannot, in an enlightened country, exist either in the use of property or in any way or manner. . . . The right to breathe the air, and to enjoy the sunshine, is a natural one; and no man can pollute the atmosphere, or shut out the light of heaven, for no better reason than that the situation of his property is such that he is given the opportunity of so doing, and wishes to gratify his spite and malice towards his neighbor." *Morse*, J., in *Burke* v. *Smith*, 69 Mich. 380, approved and unanimously adopted in *Flaherty* v. *Moran*, 81 Mich. 52, above cited.

"While one may in general put his property to any use he pleases not in itself unlawful, his neighbor has the same right to the undisturbed enjoyment of his adjoining property. . . . What standard does the law provide? . . . Whatever may be the law in other jurisdictions, it must be regarded as settled in this state that the test is the reasonableness or unreasonableness of the business in question under all the circumstances." *Ladd* v. *Brick Co.*, 68 N. H. 185, 186. "The common-law right of the ownership of land, in its relationship to the control of surface water, as understood by the courts of this state for many years, does not sanction or authorize practical injustice to one landowner by the arbitrary and unreasonable exercise of the right of dominion by another" (*Franklin* v. *Durgee, supra*), but makes the test of the right the reasonableness of the use under all the circumstances. In such case the purpose of the use, whether understood by the landowner to be necessary or useful to himself, or merely intended to harm another, may be decisive upon the question of right. It cannot be justly contended that a purely malicious use is a reasonable use. The question of reasonableness depends upon all the circumstances—the advantage and profit to one of the use attacked, and the unavoidable injury to the other. Where the only advantage to one is the pleasure of injuring another, there remains no foundation upon which it can be determined that the disturbance of the other in the lawful enjoyment of his estate is reasonable or necessary. There is no sound ground upon which a distinction can be made against the plaintiff's right to use his land for the enjoyment of the air and light which naturally come upon it, in favor of his right to use it to enjoy the waters which naturally flow upon or under it, except the fact that the use of land for buildings necessarily cuts off air and light from the adjoining estate. The fact that the improvement of real estate in this way for a useful purpose, universally conceded to be reasonable, may affect the adjoining owner's enjoyment of his estate to the same extent as a like act done solely to injure the other, is not a suffi-

cient reason for distinguishing the right to build upon the surface from the right to dig below it or to control the surface itself. Jurisdictions which reject the doctrine of reasonable necessity, reasonable care, and reasonable use, which "prevail in this state in a liberal form, on a broad basis of general principle" (*Haley* v. *Colcord*, 59 N. H. 7), as applied to the ownership of real estate, in favor of the principle of absolute dominion, may properly consider a malicious motive immaterial upon the rightfulness of a particular use; but in this state, to do so would be to reject the principle announced in *Bassett* v. *Company*, 43 N. H. 569, and repeatedly reaffirmed during the last forty years.

It is to be conceded that the maxim *sic utere tuo ut alienum non lædas* is to be applied as forbidding injury, not merely to the property, but to the right of another. *Ladd* v. *Brick Co.*, 68 N. H. 185; *Pittsburg etc. R'y* v. *Bingham*, 29 Ohio St. 364; *Letts* v. *Kessler*, 54 Ohio St. 73; *Bonomi* v. *Backhouse*, E. B. & E. 622, 643; *Jeffries* v. *Williams*, 5 Exch. 792. But the landowner's right in the enjoyment of his estate being that of reasonable use merely, there attaches at once to each the correlative right not to be disturbed by the malicious, and hence unreasonable, use made by another. To hold that a right is infringed because, by the noxious use made by another, the air coming upon a landowner's premises is made more or less injurious, and to deny the invasion of a right by an unreasonable use which shuts off air and light entirely, is an attempt to bound a right inherent and essential to the common enjoyment of property by the limitations of an ancient form of action. An unreasonable use of one estate may constitute a nuisance by its diminution of the right of enjoyment of another, without furnishing all the elements necessary to maintain an action *quare clausum fregit:* though in particular cases it may be said that no right is invaded unless something comes from the one lot to the other. *Lane* v. *Concord*, 70 N. H. 485, 488, 489; *Thompson* v. *Androscoggin Co.*, 54 N. H. 545, 552; Wood Nuis., s. 611. As, therefore, the statute does not deprive the plaintiff of any right to a reasonable use of his land, but only prohibits an unnecessary, unreasonable use, it does not deprive him of any property right. Hence it is not necessary to inquire whether, as an invasion of property rights, the limitation of the statute is one which might properly be made for the general good.

Other grounds suggested at the trial in support of the motion for a nonsuit have not been argued, and are understood to be waived. The objection based upon the unconstitutionality of the statute is not sustained, and the exception to the denial of the motions for a nonsuit and to direct a verdict upon that ground is overruled.

The defendant's wife, Ann, being a witness in his behalf, whether she had any bias, prejudice, or hostility toward the plaintiff, which might affect her testimony, was a material question. *Martin* v. *Farnham*, 25 N. H. 195. As she denied having any ill-will toward the plaintiff or his family, it was therefore proper that she should be inquired of upon cross-examination as to a statement made by her tending to show such feeling of hostility as might tend to color her testimony. She denied making such statement, but admitted that at another trial when she was present the statement in question had been testified to, and that she did not then deny it. The inquiry as to the testimony at the former trial was not made for the purpose of calling the matter to the witness' recollection, and thereby enabling her to withdraw the denial if erroneous, but for the purpose of establishing the falsity of her denial that she had made the statement, and as tending to show that the declaration was in fact made by her. The question therefore is, whether from the fact that a person present at a judicial proceeding hears in silence a statement testified to by a witness, it can be inferred that by such silence he admits the truth of the statement. " No principle is better settled than that a man's silence upon an occasion when he is at liberty to speak, and the circumstances naturally call upon him to do so, may be properly considered by the jury as tacit admissions of the statements made in his presence. . . . The circumstances must not only be such as afforded an opportunity to . . . speak, but properly and naturally called for some action or reply from men similarly situated." *Corser* v. *Paul*, 41 N. H. 24, 29 ; 1 Gr. Ev., s. 198. The neglect to reply to statements made in one's presence is not an admission of their truth unless they are addressed to the party, or made under such circumstances as to require a reply. *Gale* v. *Lincoln*, 11 Vt. 152 ; *Hersey* v. *Barton*, 23 Vt. 685, 687, 688.

The only fact appearing in the case, that the witness Ann was present at the trial when the statement in question was testified to, does not bring the case within the rule. She would have had no right to interrupt the proceedings to interpose her denial. Her attempt to do so would have been a violation of the rules of order in judicial proceedings, and if persisted in might have subjected her to punishment. Even if she were a party to the suit on trial, she would have had no more right to interrupt a witness upon the stand than any bystander, and her attempt to do so would be an equally grave impropriety. Even if she was or could have been called as a witness, her position as a party would give her no right to volunteer testimony upon the stand ; her duty would be to answer such interrogatories as might be put to her by counsel, whose duty it would be to elicit such testimony as was material

and important in the case on trial—not to call upon her to testify
for the purpose of guarding against future controversies. The
statement may have been immaterial in the former trial. It may
have been made by a witness so wanting in credibility as not to
merit denial, or the case itself may have utterly failed on the
merits against the witness, so that no reply to any part of it was
advisable. The fact, therefore, that the witness did not deny the
statement when made in her presence at a former trial, was incom-
petent as tending to establish the falsity of her testimony, and
should not have been admitted. 1 Gr. Ev., s. 198, note; *Melen* v.
*Andrews*, Moo. & M. 336; *Commonwealth* v. *Kenney*, 12 Met. 235,
257; *Blackwell etc. Co.* v. *McElwee*, 96 N. C. 71,—60 Am. Rep.
404; *Broyles* v. *State*, 47 Ind. 251. The suggestion in *Blanchard*
v. *Hopkins*, 62 Me. 119, that the rule is changed by the admission
of the parties to testify, is not sustained by the reasons for the
exclusion or the modern authorities. *Blackwell etc. Co.* v. *McElwee*
and *Broyles* v. *State, supra.* Whether the evidence of the plain-
tiff's wife as to the loss of her wedding ring had any tendency to
show such ill-will on the part of the defendant's wife toward the
plaintiff or his family as would affect her credibility, was a ques-
tion of remoteness determinable at the trial. The evidence
improperly admitted was upon a material issue, and had a plain
tendency to prejudice the defendant. For this error the verdict
must be set aside.

*Exception sustained.*

All concurred.